**ELKINS et ux. v. FOSTER.**

No. 4669.

Court of Civil Appeals of Texas. Amarillo.

Nov. 23, 1936.

Rehearing Denied Feb. 1, 1937.

Royston & Rayzor, of Houston (John R. Brown, of Houston, of counsel), for plaintiffs in error.

Ewing Werlein and W. A. Combs, both of Houston, for defendant in error.

HALL, Chief Justice.

Defendant in error, M. E. Foster, sued the plaintiffs in error, W. H. Elkins and wife, to recover damages alleged to have resulted from personal injuries received by Foster while riding in the automobile owned by Mr. Elkins and being driven by Mrs. Elkins in the city of Houston.

The substance of the second amended original petition, upon which the case was tried, is that Elkins and wife owned a Chevrolet automobile in which, about 9 o'clock on the morning of the 22d day of October, 1933, plaintiff was riding; that defendants were attempting to transport plaintiff from his home in the suburbs of Houston to the business section of the city, and the automobile was being driven West on Palm street; that as they approached Burkett street, the driver of the automobile increased its speed to thirty miles per hour and in excess of the legal speed limit; that where Burkett street intersects with Palm street, there are built into the intersection dips or depressions on either side of the center line of Burkett street at the point of intersection, which dips are from eight to twelve inches below the surrounding street level, and about two feet wide; that the dips are so constructed that they result in serious consequences if the speed laws of the state and city are not obeyed; that defendants well knew, or by the exercise of ordinary care should have known, of such dips; that they approached said dips at thirty miles per hour, in heedless disre-

gard thereof, and as they ran into and out of the dips the back portion of the car in which plaintiff was riding was caused to be thrown violently upward, and plaintiff was thrown from his position on the back seat against the top of the car, striking his head and back, and inflicting other serious injuries.

It is further alleged in substance that for some weeks prior to the date of the accident and subsequent thereto, Foster was engaged in the performance of substantial services for the defendants in this: That at defendants' request, plaintiff was attempting to secure the retention of a close relative of one of the defendants in a position which such relative held, but was on the point of losing; that plaintiff's services were performed gratuitously for defendants because of his friendship for them, and on the morning of the accident they had visited plaintiff for the purpose of discussing the matter with him, and while at plaintiff's home defendants learned of plaintiff's desire to go up town and invited plaintiff to accompany them in their automobile, their invitation being extended not only as an act of courtesy, but for the purpose of enabling defendants to further and more leisurely discuss the business matter concerning which the defendants had called to see plaintiff; that he went with them instead of in his own car for the purpose of providing an opportunity for the further discussion of the service which plaintiff was performing for the defendants, and for which plaintiff received no reward whatever, and from which the defendants expected to and did receive definite, tangible, and substantial benefit from plaintiff's services, by reason of which fact plaintiff was not a guest in the automobile within the purview of article 6701b of the Revised Statutes of Texas (Vernon's Ann.Civ.St.), and received no substantial benefit from the transportation, but was riding therein for the accommodation of the defendants without any benefit whatever accruing to plaintiff.

It is further alleged that the disabilities and injuries sustained by plaintiff were the proximate result of the negligence, heedlessness, and reckless disregard of the rights of others in driving their automobile at a high and dangerous rate of speed in excess of twenty miles per hour without keeping a reasonable look-

out for dips or other obstructions, without having inspected the brakes and keeping them in good working order, in failing to apply the brakes at a reasonable time, in failing to slow the vehicle down as it approached and entered the intersection, and in driving and operating the automobile in question without having it under reasonable and proper control, all of which constituted gross negligence and heedless and wanton acts and omissions.

The petition then describes the resulting physical injuries, and concludes with a prayer for $5,000 damages, with interest and costs of suit.

Defendants, in their second amended original answer, upon which they proceeded to trial, in addition to general demurrer and general denial, specifically denied the various acts of negligence, and then by way of affirmative defenses alleged that the damages and injuries sustained by plaintiff were caused by and contributed to directly and proximately by the negligence of plaintiff in his failure to warn the driver of the danger of operating the car in the manner in which it was being driven, and in failing to protest and to keep a reasonable lookout for dips, and in failing to brace himself from being thrown about in the rear seat.

The case was submitted upon special issues, in response to which the jury found that Foster was not the guest of defendants, but was rather one who had paid for his transportation in the defendants' automobile; that the defendants were guilty of negligence, heedlessness, and reckless disregard for the rights of plaintiff, proximately causing his injuries, in respect of the speed at which the car was being driven, the failure to keep a lookout, the failure to slow down, the failure to equip the car with adequate brakes in good working order, and failure to keep the car under reasonable control; that the accident was not an unavoidable one, and that the plaintiff, Foster, was not guilty of negligence proximately causing or contributing to cause his injuries in respect of the failure to keep a lookout, failure to warn, to demand that the speed be reduced, to demand that the brakes of the automobile be applied, or to brace or otherwise guard himself against being thrown about in the car as it might hit dips in the street or intersections. They assessed plaintiff's damages at the sum of $1,500.

Vernon's Ann.Civ.St. art. 6701b, § 1, is as follows: "No person transported over the public highways of this State by the owner or operator of a motor vehicle as his guest without payment for such transportation, shall have a cause of action for damages against such owner or operator for injuries, death or loss, in case of accident, unless such accident shall have been intentional on the part of said owner or operator, or caused by his heedlessness or his reckless disregard of the rights of others."

Section 2 of the act has no application to this case.

■ The appellants submit their case upon five propositions, and the only error of which complaint is made in any of them is the action of the court in overruling appellants' motion for an instructed verdict in their behalf. Each proposition challenges the sufficiency of the evidence or the want of evidence to support the jury's findings upon the issues of whether Foster was a guest within the terms of the "guest statute," and whether the appellants were guilty of heedlessness and a reckless disregard of the rights of Foster within the meaning of the article of the statute just quoted. We have, therefore, two questions for decision: First, was Foster a guest at the time of the injury? and, second, Were appellants guilty of heedlessness and a reckless disregard for Foster's safety? In our opinion, it will not be necessary to consider the second question.

Except Joe Litterst, a professional photographer who took some photographs of the place of the accident, all the testimony elicited from Mr. and Mrs. Elkins and from Mr. Foster.

It is shown that Elkins had resided in Houston a long time where he was engaged in the operation of a barber shop of which he was part owner; that he had known Foster for many years and had been Foster's barber; they were friends and Foster thought highly of Elkins. It appears that Elkins had a brother who had been appointed under the former Republican administration as postmaster at Freeport, Tex., and some time before the day of the accident, possibly four weeks, Elkins had talked to Foster about the possibility of his brother losing his postmaster's position upon the incoming of the Democratic administration. Foster is

the editor of one of the leading daily papers in Houston, and a man of considerable influence, and Elkins thought that Foster might be able to exert his influence so that the brother, in spite of political changes, might remain as postmaster at Freeport, and he accordingly talked with Foster about it. They differ as to where the conversation occurred, but that is immaterial.

Some time subsequent to this interview, Foster wrote a letter to Congressman Mansfield, apparently recommending that the Democratic administration favor Elkins' brother and retain him as postmaster. Foster's efforts were prompted by his friendship for Elkins.

According to Elkins' recollection, the next time he talked to Foster about the progress he was making was on Sunday preceding the Sunday on which the accident occurred, and at which time, as he did on the day of the accident, he called Mr. Foster over the phone and offered to go out to Foster's home and shave him so they could discuss the developments in the matter. Foster seems not to have remembered this interview, as he places the next conference after the first as of the day of the accident. It was Elkins' recollection that on Sunday preceding the date of the accident Foster had informed him that he had received a letter from Congressman Mansfield, and as a dinner was to be given on the following Saturday (the day preceding the accident) for Postmaster General Farley, he would talk to Congressman Mansfield in person about Elkins' brother at that time.

About 8:30 on the morning of the accident, Elkins called Foster at his home, telling him that he would like to discuss the matter with him if he would permit him to come out, and he would bring his tools along and give Foster a shave. Elkins wanted to know the result of the anticipated conference between Foster and Mansfield. Mrs. Elkins drove the car and remained in the car outside while Elkins was in Foster's home shaving and talking to him. During the shaving process they had no discussion of the matter as Elkins did not ordinarily talk to his patrons while shaving them. After his work was finished they had a short conference about developments in regard to the brother retaining the job as postmaster, but the conference was not an extended one, as it was apparent to Elkins that Foster was in a hurry to go down town to the Houston Club. Elkins heard Foster summon his chauffeur to get the car out and take him to town and said to Foster, "I will take you down town. I have my car and you can ride with me." Foster's statement is that Elkins said, "I will take you back to town. I would like to take you. I want to continue the discussion." After this invitation and its acceptance, they got into Elkins' car, with Foster riding on the back seat alone, and Mrs. Elkins driving.

Elkins testified that it was his intention to talk to Foster on the way to town somewhat further about the progress the latter was making in connection with Elkins' brother, but as Foster was talking about the banquet and various other things, the conversation had not yet led up to that specific matter at the time of the accident. Foster's recollection is that some discussion was had about the brother's case while they were riding in the car, though this conversation was not carried on during the greater part of the time while going from Foster's house to the point of the accident, and what was said on the subject was confined primarily to how the brother had conducted himself in his position as postmaster, the value of having his brother retained as postmaster, etc.

It was shown that Elkins' brother remained as postmaster at Freeport about a year after his term had expired, but there is no evidence as to when it expired or any explanation as to why he was permitted to remain on the job for a year thereafter.

Elkins' effort to assist his brother by enlisting the influence of Foster was undertaken by him out of a desire to help his brother. It appears that Elkins and his brother were on a note together for $500, and that Elkins, during the year in which the brother's term was extended, paid half the amount and his brother paid half. Elkins admitted that Foster's efforts to keep his brother on the job would be of financial assistance to him, and that the efforts of Foster were a personal accommodation to him; that the brother's financial condition was bad at that time. Elkins had solicited the influence of other prominent persons at that time. The

record is not clear as to whether Congressman Mansfield was at the banquet given in honor of Postmaster General Farley, but it appears that Foster, in addition to writing to Mansfield, talked to him about the matter prior to the accident.

The parties left Foster's home about 9 o'clock on Sunday morning to go to the Houston Club, where Foster intended to get out of the car, and it was contemplated that the Elkins would then drive out to their home in order to get their daughter and take her down to the church in time for Sunday school which commenced at 9:45. The car was being driven at the time of the accident at approximately thirty miles per hour, and during the time preceding the accident there was a general conversation among the parties, and the testimony is that Mrs. Elkins may have occasionally looked back toward the rear seat or taken her eyes off the road directly in front of her while addressing one or both of the other occupants, but there is no evidence that just before the accident she had turned her eyes away from the road.

A couple of blocks above the intersection of Palm street and Burkett street, where the accident occurred, the car turned on to Palm street, its speed being naturally reduced, and after straightening up on Palm street and seeing no traffic or any other hazards, the speed of the car was again increased to thirty miles per hour a considerable distance before reaching the place of the accident. The speed had been gradually increased, without any jerking.

On the trip from Foster's home to the point of the accident, no complaint was made by Foster as to the method or manner in which the car was being driven, the occasional glancing backward of Mrs. Elkins while driving the car, the speed at which the car was being driven, or the lookout which she might be keeping, nor was any protest of any kind made by Foster, or any other occupant of the car. In so far as it appeared to Foster, Mrs. Elkins was driving the car in a safe and proper manner. Mrs. Elkins had no recollection of ever having been on that part of Palm street before, and it was not until the car was right on to the intersection, and at a point too close for her to stop, that she discovered the existence of this dip or depression in the street. The sun was shining brightly, and apparently producing some glare upon the pavement, which made the discovery of the dips more difficult.

Mrs. Elkins stated that at the time she increased the speed after turning the corner on to Palm street, she observed the street but did not see the dips. Proceeding at about thirty miles an hour, she came upon the intersection when she first saw the dip and immediately called, "Whoopee," and tried to stop the car as quickly as possible. As the car passed over the depression or bump on the east side of the intersection, the back end of the automobile suddenly went down and then came up, throwing Mr. Foster toward the top of the automobile, and before it came to a complete stop at least the front wheels were across the bump or depression on the west side of the intersection. It was admitted that if the car had been going twenty miles an hour instead of thirty, the car could have been stopped in time so that there would have been but a jar. The car was a new one, but the brakes were known by the defendant to have a tendency to grab when suddenly applied so as to stop the car too quickly. Mrs. Elkins stated that she made an immediate effort to stop the car quickly, and as the car went across the dip it bounded, threw Mr. Foster up so that to her he appeared as a shadow back of her.

When Elkins solicited Foster's influence in behalf of his brother, the request was made as a personal accommodation to Elkins, without any offer of reward or compensation for the service to be performed by Foster, and without any expectation of reward upon Foster's part. Foster had neither asked nor expected any compensation for his service, and had such offer been made he stated it would have been deeply resented. Foster's efforts were out of regard for the friendship which he held for Elkins, and such efforts were entirely apart from the question of his being transported to town on the day of the accident because he was not paying for the ride, and even though Elkins had not invited him to ride to town with him that morning, he still would have done what he could in assisting the brother to retain the job as postmaster.

As hereinbefore stated, Elkins testified that Foster's efforts in behalf of the broth-

er were of both financial assistance and personal accommodation to him, and that retaining the postmastership for the additional year helped Elkins' brother to pay off the $500 note. This is the only testimony we have seen in the statement of facts upon which a finding that Elkins had been directly benefited by Foster's efforts could be predicated. Elkins was not cross-examined with reference to this statement, and there was no objection to the admission of the testimony.

■ The only other contention necessary to be discussed is that the Texas "guest statute" is unconstitutional. We overrule this contention.

In 4 Blashfield's Encyclopedia of Automobile Law & Practice (Permanent Edition) p. 102, § 2313, it is said: "While statutes of this character, which look primarily to abolition of a guest's remedy for injuries, have been held unconstitutional as violative of constitutional provisions that every man shall have a remedy by due course of law for injury done him in his person, property, or reputation, where the legislation emphasizes the restriction on the operator's duties rather than on the guest's remedies, statutes in this form have in general been held good as against constitutional objections, and regarded as a proper exercise of the police power and not violative of the due process clause."

The author further says that statutes of a more comprehensive nature which undertake to relieve an automobile operator from all liability for injuries suffered by a nonpaying passenger, whatever the degree of negligence, have been held unconstitutional. The Texas statute is clearly within the description of the first class of acts described by the author, and we therefore hold that it is not unconstitutional.

We deem it unnecessary to discuss any other features of the case. Under the statement by Elkins that Foster's efforts had been of financial assistance to him, the court would have erred in directing a verdict as contended by appellants.

The judgment is, therefore, affirmed.

## On Motion for Rehearing.

In their motion for rehearing, appellants' principal contention is that we erred in holding that the trial court properly admitted testimony from Elkins that Foster's efforts in behalf of Elkins' brother were of both financial assistance and personal accommodation to him, and that retaining the postmastership for the additional year helped Elkins' brother to pay off the $500 note upon which Elkins was also liable.

The statement in our original opinion that there was no objection to the admission of the testimony was probably not sufficient. The objection made was that the testimony was incompetent. This is an insufficient objection, unless it is stated why the testimony is incompetent.

At common law a witness may be incompetent on account of a want of understanding or a defect of religious belief, a conviction of certain crimes, infamy of character, or interest. While, of course, religious belief and interest does not render a witness incompetent under the statutes in this state, an objection to the testimony of such a witness that it is incompetent should, as a general rule, be urged as against the witness testifying at all.

As said in Bell v. Bumstead, 60 Hun, 580, 14 N.Y.S. 697, an objection to evidence of a person with reference to his transactions with one since deceased that it is incompetent evidence is not sufficient to exclude it for evidence of that character from a witness not under disability would not be incompetent. The evidence itself would be competent, but a witness under the disability would not be competent to give the evidence, and the objection should be put upon the grounds of disability of the witness and not of the incompetence of the evidence offered.

In this case any testimony showing or tending to show a material benefit resulting from the efforts of Foster in behalf of Elkins was material and relevant, and when elicited from either of the parties was certainly not incompetent.

Evidence may be incompetent because it is not based on the personal knowledge of the witness, and may at the same time be relevant and material. Hearsay testimony is an illustration of this rule. A third party may make a statement which is both material and relevant to the issues being tried, and his testimony from the witness stand, or by deposition, be

300

competent, but if still another party should undertake to testify as to what he said, this testimony would be incompetent upon the ground of hearsay.

Under certain conditions prescribed by the statutes, the testimony of either the wife or husband is incompetent when offered as against the other spouse, though the facts may be material and relevant and would be admissible if the proof was offered as coming from another source.

■ While, as stated in the motion, the movant did object to this testimony, the objection cannot be considered by this court because insufficient, and the ground of incompetence, if any, was not stated.

Counsel cited the leading case of Henry v. Phillips, 105 Tex. 459, 151 S.W. 533, 537, in support of their contention. In that case Judge Dibrell said that certain facts insufficient to show the delivery of a deed by T. J. Patillo were incompetent and stated: "While the admission of this testimony was not objected to by counsel for defendants, that fact would be important only in the event its admission was afterwards complained of as violative of a right reserved to defendants. Such incompetent testimony can never form the basis of a finding of facts in an appellate court, notwithstanding its presence in the record without objection. When the appellate court comes to apply the law to testimony constituting the facts of the case, it can only base its conclusion upon such testimony as is under the law competent. That which is not competent testimony should be given no probative force. The admission of such testimony is no talisman to give effect to that which is irrelevant and incompetent to sustain or deny a material issue in a case." See, also, W. L. Moody & Co. v. Rowland, 100 Tex. 363, 99 S.W. 1112.

We find no other matter in the motion which has not heretofore been discussed in briefs and disposed of. Since movant insists that this testimony was really and legally objected to, we will withdraw the statement from the original opinion that the testimony was admitted without objection.

The motion is overruled.